FOR THE

## COUNTIES OF FRANKLIN AND HAMPSHIRE, AT NORTH-AMPTON, SEPTEMBER TERM 1870.

PRESENT:

Hon. REUBEN A. CHAPMAN, CHIEF JUSTICE.
Hon. HORACE GRAY, JR.,
Hon. JOHN WELLS,
Hon. JAMES D. COLT,       } JUSTICES.
Hon. MARCUS MORTON,

## FRANKLIN COUNTY.

### ATTORNEY GENERAL vs. PROPRIETORS OF DEERFIELD RIVER BRIDGE.

A statute passed in 1797 chartered a corporation to build and maintain a bridge; author-ized it to levy tolls "to commence on the day of the opening of the bridge for passen-gers and continue for and during the term of seventy years, at the end of which term the bridge shall be disposed of by the government as the legislature shall think proper;" and provided that the bridge should "be kept in good repair for the term aforesaid, and at the end of the term be in like repair." The corporation opened the bridge for passen-gers November 8, 1798; and maintained it, and collected tolls, until November 8, 1868. In June 1868, the legislature passed a statute to take effect November 14, 1868, laying out the bridge as a highway to be kept in repair by the town; providing that the collec-tion of tolls should cease on that day, that nothing in this statute contained should re-lease the corporation from its liability to keep the bridge in good repair up to that day, and that, if it should not be "in such repair on said date," the attorney general, at the

relation of the selectmen of the town, should file an information to compel the corpora-tion to put it in good repair; and giving to this court full power and authority to hear and determine the cause and make and enforce all necessary decrees therein. *Held,* that the St. of 1868 was constitutional. *Held, also,* that after an allegátion, in an informa-tion filed under it by the attorney general at the relation of the selectmen, that the cor-poration was bound to keep the bridge in good repair for "the term of seventy years from and after the day of the opening of the bridge for passengers," a further allegation that "during the latter part of the term aforesaid the bridge was not kept by the corpora-tion in good repair, and was not in such repair at the end of said term, to wit, November 14, 1868," sufficiently alleged that the bridge was out of repair at the date of the actual end of the term, notwithstanding the erroneous statement of that date after the videlicet, and notwithstanding a like statement, in a preceding part of the information, of that date as the 14th instead of the 8th of November. *Held, further,* that under this information evidence of the condition of the bridge on November 14, 1868, was competent, (1.) as showing strict compliance with the proviso of the statute as to the filing of the informa-tion, and (2.) as tending to show what was its condition on November 8, 1868. *Held, further,* that if on November 8, 1868, equally with November 14, 1868, the bridge was not in good repair, and pending the information was put into such repair by the town, the corporation might be decreed to pay to the town whatever would have been the ex-pense of due repairs on November 8, 1868.

INFORMATION filed November 17, 1868, by the attorney gen-eral, at the relation of the selectmen of Deerfield for that year, pursuant to the St. of 1868, *c.* 294, § 3, representing that the Proprietors of Deerfield River Bridge, under and in pursuance of the St. of 1797, *c.* 17, by which they were chartered as a cor-poration, and soon after its enactment and their organization, built a bridge over Deerfield River in the town of Deerfield, opened it for passengers November 14, 1798, and maintained it from that date until November 14, 1868, collecting and receiving meanwhile tolls granted by the charter ; that the charter provided that, at the expiration of the term of seventy years from and after the day of the opening of said bridge for passengers, it should be disposed of by the government as the legislature should think proper, and further provided that the bridge should be kept by the corporation in good, safe and passable repair for the term aforesaid, and be in like repair at the end of said term ; that the St. of 1868, *c.* 294, (which took effect November 14, 1868, laid out the bridge as a public highway, and imposed on the town of Deerfield the duty of maintaining it and keeping it in repair,) was passed in pursuance of the St. of 1797, and contained an express provision that nothing in itself contained should be con-strued to release the defendants from their liability to keep the

said bridge in good, safe and passable repair up to the expiration of the term aforesaid; that during the latter part of the term aforesaid the said bridge was not kept by said corporation in good, safe and passable repair, and was not in such repair at the end of said term, to wit, on November 14, 1868, and at said last mentioned date the flooring and main timbers and masonry of it were so defective (in particulars which the information specified) that the bridge was unsafe; that the corporation neglected and refused to repair the bridge, and was about to wind up its business and distribute among its stockholders the moneys in its hands derived from tolls and other sources; and that the informant was apprehensive that thereby the corporation would become disabled to fulfil its obligation to repair the bridge, wherefore he prayed for an injunction on the corporation against alienating any of its property except to pay its debts or repair the bridge, and for such other and further relief as the nature of the case might require.

The answer admitted the organization of the corporation and its building of the bridge under the St. of 1797; but denied that the bridge was opened for passengers on November 14, 1798, and that the corporation had maintained it from that date till November 14, 1868, collecting and receiving tolls meanwhile, as alleged in the information; denied that the St. of 1868, *c.* 294, was passed in pursuance of the St. of 1797, *c.* 17, or had any effect to dispose of the bridge under the authority reserved in the St. of 1797; admitted that by the St. of 1797 the corporation was bound to keep the bridge in good, safe and passable repair for the term of seventy years from and after the day of opening it for passengers, and to have it in like repair at the end of said term; but denied that during the latter part of said term, or at any time, the bridge was not kept by the corporation in due repair; denied that the 14th of November 1868 was the end of the term, and that the bridge was not in such repair on that day; denied that it was not in due repair at the end of the term; and continued as follows: " And the defendants for further answer say, that the bridge was opened for passengers on November 8, 1798, and that the last day of the term of seventy years, specified in the St.

of 1797, was the 7th day of November 1868; that the bridge was by them kept in good, safe and passable repair at all times during the term for and during which they were incorporated as proprietors, and at the end of said term was in good, safe and passable repair, as required by their charter; and that after the 7th day of November 1868 they ceased to take tolls on the bridge or to exercise any acts of ownership over the same, and, no provision having been made by the legislature relative to the disposal of the bridge, on that day they abandoned the same and left the same standing as it was, in good, safe and passable repair. And the defendants further say that the informant cannot sustain his information; and, not admitting but denying the allegations therein, except so far as heretofore admitted in their answer, the defendants deny that the facts set forth in said information furnish any ground upon which the prayers thereof can be sustained and upon which the defendants can be held to respond, and they deny that the information sets forth or shows any ground of complaint, or any case requiring, demanding or justifying the relief sought for, or any relief touching the matters complained of; and the defendants claim for their answer, so far as it is applicable and appropriate therefor, the same benefit and advantages as if they had formally demurred to the information."

The case was referred to a master to find the facts, who made a report of which the following are the material parts:

"The defendants, under their charter, built a bridge, and opened it for passengers on the 8th of November 1798, and maintained the same bridge and other structures in place of the same until through November 7, at midnight, in the year 1868, when they ceased to take toll. The bridge was opened to the public travel free of toll, on November 8, 1868. An examination of the condition of the bridge was made on November 14, 1868, by the relators, with the assistance of other persons possessing peculiar skill and experience in the construction of bridges. The relators and the other persons referred to were witnesses at the hearing before me, and described with minuteness of detail the condition of the bridge at that time; and from some of these witnesses, and from others, there was testimony in regard to the condition

of the bridge for a few weeks before November 14, 1868, and afterwards. All this evidence tended to show that during the period embraced by it, from a few weeks before November 14, 1868, to the time when the relators commenced repairs upon it, there was little if any change in its condition ; and the facts found by me in regard to its state of repair apply as well to its condition on the 8th of November 1868 as to its condition on the 14th of November of said year.

" I find that at said last mentioned dates said bridge was not in good, safe and passable repair. The north abutment of the bridge, owing perhaps partly to a defect in its original construction, was badly bulged, and a portion of it, fronting the river, was loosened and separated from its wing wall. Many of the stones composing it were loosened and shoved toward the river. The bond of the masonry was broken, and joints were open. Its general appearance indicated a liability to be thrown down easily, or to tumble down. The masonry of the south pier was also in some parts bulged out and loose. The stones were in many places separated from each other, and the bond of the mason work appeared broken. The north end of the bridge had settled, as the evidence showed, about fourteen inches, and earth in considerable quantities had washed in upon it at that point. The timbers were more or less decayed for about twenty feet from that end. In that part of the bridge, one of the beams supporting the floor planking had decayed so much as to break or split off, so that the floor planks which had rested upon it were loose and without support at one end. Some of the posts were rotten at the bottom, so that the braces resting at the foot of the posts had crushed them. Some of these posts had been secured with irons, but not all of them. The planking of the bridge was in some places worn very thin, having been in use a long time. The arch beams on one side of the bridge were rotten, and one of them was broken.

" To several of the witnesses introduced on the part of the relators, who were admitted or proved to be experts on this subject, the question was put, ' What in your opinion was the condition of the bridge, as to being safe ? ' This question was objected to by the defendants, but I admitted it, and the witnesses testified

that they did not consider the bridge safe, and gave as reasons the facts before stated. In coming to the result that I have al-already stated in regard to the condition of the bridge, I have formed my opinion upon the facts stated by the witnesses, and not upon the opinions expressed by them.

" It was proved upon the part of the defendants, that, notwithstanding the condition of the bridge as shown to exist on the 8th and 14th of November 1868, it continued to be used for public travel, with some slight repairs, until the spring or summer of 1869, when the north abutment was taken down by the town of Deerfield and rebuilt. During this period, at times very heavy loads passed the bridge without accident. The town of Deerfield, in repairing the bridge, undertook to raise the structure some feet higher than it was before, and in the course of this operation a portion of the bridge fell, so that it cannot now be repaired, but must necessarily be rebuilt.

" All the evidence offered to show the condition of the bridge when it was examined on the 14th of November 1868 was objected to by the defendants as irrelevant, but was admitted subject to their objection.

' Having been requested by both parties, if I should find that the bridge was not in good, safe and passable repair, to report the amount of the damages sustained by the town of Deerfield in consequence of this breach of duty on the part of the defendants, I received evidence upon this point. The counsel for the relators offered the testimony of several engineers and bridge builders, who were either proved or admitted to be experts upon this subject, to show that the only way to repair the north abutment and the south pier would be to take them down and rebuild them; and these witnesses were permitted to state what would be the expense of thus taking down and rebuilding. To this evidence the defendants objected, and the question of its admissibility is reserved for the opinion of the court. No other evidence as to the amount of damages was produced. Upon the whole evidence as to the question of damages, I find that, taking the bridge as it was on the 8th and 14th days of November 1868, the expense of putting it into good, safe and passable repair would be $4000."

On this report and the pleadings, the case was reserved for the determination of the full court. The St. of 1868, *c.* 294, and the material parts of the St. of 1797, *c.* 17, are printed in the margin.\*

*S. O. Lamb,* for the Attorney General.

---

\* The St. of 1797, *c.* 17, was passed on June 22, 1797. By §§ 1, 2, certain persons were incorporated under the name of the Proprietors of Deerfield River Bridge, for the purpose, set forth in the preamble of the statute, of "erecting a bridge over the river in the town of Deerfield, where Williams's Ferry is now kept." Section 3 provided "that, for the purpose of reimbursing the said proprietors the moneys by them expended or to be expended in building and supporting the said bridge, a toll be and is hereby granted and established for the sole benefit of the said proprietors, according to the rates following," and specified the rates, "and the said toll shall commence on the day of the opening of said bridge for passengers, and shall continue for and during the term of seventy years, at the end of which term the said bridge shall be disposed of by the government as the legislature shall think proper." Section 4 provided "that the said bridge shall be well built, at least twenty-four feet wide, of sound and suitable materials, with well constructed substantial piers on each side, and well planked on the top and sides with planks proper for such a bridge; and the same shall be kept in good, safe and passable repair for the term aforesaid, and at the end of said term shall be in like repair."

The St. of 1868, *c.* 294, was passed June 4, 1868, as follows:

"Section 1. The bridge over Deerfield River in the town of Deerfield, belonging to the Proprietors of Deerfield River Bridge, is hereby laid out as a public highway; and the collection of tolls thereon shall cease on the fourteenth day of November next.

"Section 2. The said bridge shall be maintained and kept in repair by the town of Deerfield.

"Section 3. Nothing in this act contained shall be construed to release the Proprietors of Deerfield River Bridge from their liability to keep the said bridge in good, safe and passable repair up to the said fourteenth day of November next; and if the said bridge shall not be in such repair on said date, an information shall be filed in the supreme judicial court in behalf of the Commonwealth by the attorney general, at the relation of the selectmen of Deerfield, against said corporation and its officers, to compel said corporation to put the said bridge in good, safe and passable repair. And full power and authority is hereby given to said court, as a court of chancery, to hear and determine said cause, and to make and enforce all necessary orders and decrees therein.

"Section 4. This act shall take effect on the fourteenth day of November next."

*W. S. B. Hopkins*, (*D. Aiken* with him,) for the defendants.
1. The rights and liabilities of the defendants were vested and
fixed by their charter in 1797; and any subsequent statute affect-
ing them is invalid. The St. of 1868, *c.* 294, is invalid accord-
ingly.

2. The charter expired at midnight of November 7, 1868, ac-
cording to its terms and the fact found by the master. The St.
of 1868 attempts to extend the liabilities of the corporation to
November 14, 1868. The legislature has undertaken to exercise
judicial functions in determining the time when the charter ex-
pired; and there is no power in any court to correct its mistake.

3. No provision was made for the disposal of the bridge at the
expiration of the charter; and the corporation is not bound by
any act disposing thereof at any other time, which it has not ac-
cepted.

4. The evidence as to the condition of the bridge on November
14 was improperly admitted. If admitted to show the condition
of the bridge on November 14, it was so by force of an invalid
statute. If admitted to show its condition on November 7, then
it was incompetent, for the reason that this proceeding is based on
the St. of 1868, and can inquire into the condition only on No-
vember 14.

5. There is no jurisdiction in this court, or validity to this
process, unless the inquiry is directed to the point of time when
the charter really expired; and this inquiry, being directed by
the statute and the information to November 14, is unauthorized.

6. The St. of 1868, conferring special jurisdiction and enacting
a special remedy, must be strictly construed; and under it juris-
diction is given to the court, authority for the process, and effect
to the statute, eight days after the corporation ceased to exist,
and the inquiry instituted is to determine if on the eighth day
after its demise the corporation had in good, safe and passable
repair a bridge which it formerly owned.

7. This information is authorized by the St. of 1868 only to
compel the corporation to put the bridge in good, safe and pass-
able repair. The town, by its own act of altering the construc-
tion of the bridge by raising it, destroyed a portion of it, and has

rendered it impossible for the corporation to put it in such repair as is required by the statute.

8. General damages are not authorized under the St. of 1868, on this or any other state of facts.

9. The St. of 1868 is unconstitutional and invalid, inasmuch as it impairs vested rights, extends fixed liabilities, and assumes judicial functions; there is no jurisdiction in the court, and no legal authority for the process. *King* v. *Dedham Bank,* 15 Mass. 447, 454. *Commonwealth* v. *New Bedford Bridge,* 2 Gray, 339. *Commonwealth* v. *Essex Co.* 13 Gray, 239, 252.

GRAY, J. The principal difficulty in this case has arisen out of the fact that the legislature, in the St. of 1868, *c.* 294, seems to have assumed that the date of the original opening of the bridge for passengers was the 14th, when in fact it was the 8th of November 1798, and that the term of seventy years, for which tolls were granted and established thereon by the St. of 1797, *c.* 17, for the benefit of the defendants, accordingly ended on the 14th, instead of the 8th of November 1868. But upon a consideration of the provisions of the two statutes, of the allegations in the information, and of the facts found by the master, we are of opinion that this mistake affords no ground for refusing the relief asked for.

Authority to file this information is expressly given to the attorney general, and jurisdiction of the same conferred upon this court as a court of chancery, by the St. of 1868, *c.* 294, § 3, if the bridge should not be in good, safe and convenient repair on the 14th of November 1868; and the master finds that the bridge was not in such repair at that date. It is unnecessary therefore to consider whether the case would have been within this statute if the bridge had ceased to be out of repair after the 8th, and before the 14th of November; or whether the information could have been sustained under the general equity jurisdiction of the court. See *Attorney General* v. *Tudor Ice Co.* 104 Mass. 239, and cases there cited.

The St. of 1797, *c.* 17, § 4, required the defendants to keep the bridge in good, safe and passable repair for the term of seventy years from the 8th of November 1798, that is, until the 8th of

November 1868. The provision of the St. of 1868, *c.* 294, § 3, that nothing in this act contained shall be construed to release the defendants from their liability to keep the bridge in such repair up to the 14th of November, certainly did not exempt them from such liability before the 8th of November 1868; and is well described in the information as a provision that nothing in this act contained should be construed to release them from " their liability to keep the said bridge in good, safe and passable repair up to the expiration of the term aforesaid," which is stated in the next preceding paragraph to be " the term of seventy years from and after the day of the opening of said bridge for passengers." The further allegation that " during the latter part of the term aforesaid the said bridge was not kept by said corporation in good, safe and passable repair, and was not in such repair at the end of said term," would at least cover the period of a week before the end of the term. Neither the statement of this last date, under a videlicet, as the 14th of November, followed by a specification of the nature of the want of repair at this date, nor the previous statement, near the beginning of the information, of the date of the opening of the bridge as the 14th of November 1798, is a material variance, or can have misled or embarrassed the defendants.

The master finds that the bridge was equally out of repair on the 8th and the 14th of November 1868, and that this want of repair was of such a character that it must have existed for a much longer period of time than between these two dates. The evidence, admitted before the master, of the condition of the bridge on the 14th of November, was competent, not only as showing a strict compliance with the condition contained in the St. of 1868, *c.* 294, § 3, authorizing the filing of this information, but also as tending to show the condition of the bridge on the 8th of November.

Under the provision of the St. of 1797, *c.* 17, § 3, that at the end of the term of seventy years the bridge should be disposed of by the government as the legislature should think proper, the legislature clearly had the power, by an act passed before the expiration of the term, to lay out the bridge as a public highway

to make no provision for its repair for a week afterwards, and then require it to be kept in repair by the town of Deerfield. The authority of the legislature to enforce through appropriate judicial proceedings the liability of the defendants under their charter to keep the bridge in repair until the end of the term was not lost or affected by adopting other measures of precaution to have the bridge kept in repair afterwards for the safety and convenience of the public.

Allowing, therefore, to the St. of 1868 the construction most favorable to the defendants, the subsequent repair of the bridge by the town under the obligation thus imposed upon them, while this suit has been pending, does not affect the extent of the defendants' liability for their neglect to perform their own corporate duty, but only the appropriate form of relief.

As the bridge has now been repaired, specific performance cannot be decreed against the defendants. But, according to the practice of courts of equity in cases where the specific relief originally prayed for becomes unsuitable by reason of new circumstances, damages may be awarded. And upon this information, filed at the relation of the selectmen and for the benefit of the town of Deerfield, the proper decree will be, that the defendants pay to the town the sum of $4000, assessed by the master as the expense of putting the bridge in good, safe and suitable repair at the time when the defendants failed to comply with their duty in this respect.                        *Decree accordingly.*